IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 22, 2000 Session

## JIMMY GREENE v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Blount County**
**No. 11391      D. Kelly Thomas, Jr., Judge**

_____

**No. E2000-00426-CCA-R3-PC**
**March 6, 2001**
_____

A Blount County jury convicted the Petitioner of the aggravated rape of a person less than thirteen years of age, and the trial court sentenced him to twenty-two years incarceration. His conviction was affirmed on direct appeal. The Petitioner petitioned for post-conviction relief, and the trial court denied his request. He now appeals the trial court's denial of post-conviction relief, arguing that he received ineffective assistance of counsel at trial and on appeal. We conclude that the Petitioner was not denied the effective assistance of counsel and accordingly affirm the judgment of the court below.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID H. WELLES, JJ., joined.

Lance E. Evans, Maryville, Tennessee, for the appellant, Jimmy Greene.

Paul G. Summers, Attorney General and Reporter; Clinton J. Morgan, Assistant Attorney General; Michael L. Flynn, District Attorney General; Kirk E. Andrews, Assistant District Attorney General; and Edward P. Bailey, Jr., Assistant District Attorney General; for the appellee, State of Tennessee.

**OPINION**

In 1995, a Blount County jury convicted the Petitioner, Jimmy Greene, of the aggravated rape of a person less than thirteen years of age, and the trial court sentenced the Petitioner to twenty-two years incarceration. This Court affirmed the Petitioner's conviction on appeal, and the Tennessee Supreme Court denied permission to appeal. See State v. Jimmy Greene, No. 03C01-9608-CC-00316, 1997 WL 677938 (Tenn. Crim. App., Knoxville, Oct. 31, 1997). The Petitioner then filed a pro se petition for post-conviction relief, which he later amended following appointment of counsel to represent him in post-conviction proceedings. The post-conviction court conducted a hearing on the petition and denied post-conviction relief. The Petitioner now appeals the ruling of the trial

court, arguing that he received ineffective assistance of counsel at trial and on appeal. Specifically, he contends that his attorney was ineffective for (1) failing to demand a bill of particulars from the State; (2) failing to appeal the State's alleged failure to appropriately elect an offense for which it could seek a conviction; (3) failing to effectively cross-examine the victim at trial; (4) failing to properly advise the Petitioner concerning his right to testify and his right to seek a plea agreement; and (5) failing to inform the trial court of allegations that a State witness entered the jury room with the jury during trial. We affirm the judgment of the trial court.

## I. FACTUAL BACKGROUND

### A. FACTS PRESENTED AT TRIAL

On direct appeal, this Court summarized the facts underlying the Petitioner's conviction as follows:

The proof shows that on or about June 24, 1991, four-year-old A.L. [the victim] first revealed to her paternal grandmother that A.'s stepfather, Appellant Jimmy Greene, had performed certain sexual acts upon her. At the time of the alleged incidents, A. resided with her mother and her stepfather, Appellant herein. On June 28, 1991, A.'s grandmother took her to the emergency room at Blount Memorial Hospital for a sexual abuse examination. As a result of the allegations and subsequent investigation of sexual abuse, A.'s grandmother obtained legal and physical custody of A.

At trial, the court permitted A. to use anatomically correct dolls to facilitate her explanation of the sexual acts to which she was subjected. A. testified that her stepfather inserted his fingers into her vagina, which she referred to as her "poopy-cat," and her rectum. A. further testified that Appellant "put his poopy-cat [penis] in my mouth and he played with my poopy-cat and bottom." Finally, A. stated that Appellant inserted his penis into her mouth and "peed" and "made me swallow it."

On October 3, 1991, four months subsequent to the last incident of sexual abuse, Dr. Gerald Blossom examined A. as part of the investigation into the allegations of sexual abuse. By the time of the trial, Dr. Blossom was employed at Children's Hospital in Knoxville as an emergency pediatrician. At trial, Dr. Blossom testified that when examining A., he noted some thickening of the hymenal membrane at approximately the four to five o'clock position. He stated that the hymenal membrane is typically thin and that the abnormal thickening of A.'s hymenal membrane would have been caused by rubbing an object across and against the membrane. Dr. Blossom further testified that his examination also revealed that A.'s hymenal opening measured one centimeter in diameter. Dr. Blossom then proceeded to elaborate on the significance of this abnormal measurement. "This is approximately twice the size you would expect to see in a four-year-old girl." While acknowledging that normal variations exist in the size, shape, and width of hymenal openings in four-year-old females, Dr. Blossom also emphasized, "This is about twice the average to maximum size. . . . [T]his is much more than you would ever

expect to find in a normal situation." Dr. Blossom also explained that the only way in which the hymen could be stretched to a much larger diameter than normal, as was A.'s, is through direct and forcible penetration. He further testified that the more times that the hymen is stretched, the less likely it is that the hymen will return to its normal condition. Finally, Dr. Blossom opined that A.'s vagina had been forcibly penetrated.

(Footnote omitted.)

## B. FACTS PRESENTED AT THE POST-CONVICTION HEARING

At the post-conviction hearing, the Petitioner summarized his complaints about his representation at trial. He stated that the litigation in his case spanned approximately four years. He testified that he spoke with his trial attorney (counsel) only once before trial and complained that she refused to discuss the possibility of a plea agreement with him until he "waived [his] rights . . . to a trial . . . ."

The Petitioner testified that he met with counsel approximately six times over the course of her representation. He maintained that his last in-person meeting with her occurred approximately a year before trial. He maintained that he and counsel did not meet or prepare together for trial at any time subsequent to their meeting a year prior to trial. He stated that his last contact with counsel before trial occurred when she telephoned his wife three days prior to trial to inform him of his impending trial date. He claimed that when he did call counsel, she always told him "everything is looking okay" and then informed him that she had another appointment. He claimed that when he called her, "all she'd do was ask [him] if [he] wanted to waive [his] rights."

The Petitioner further complained that counsel did not discuss trial preparation with him. He testified that she failed to discuss with him any witness interviews, medical records, any interviews with the victim, or trial strategy. He further testified that she did not advise him of his constitutional right to testify and would not discuss the possibility of him testifying at trial. Instead, he claimed, she "just plain out told me that she was not going to put me on the stand" because of a prior conviction he had received for theft.

The Petitioner also testified that he and counsel discussed a possible witness, named Meme Laney, whom the Petitioner stated would have testified on his behalf. He stated that counsel told him that she would contact Laney but that she did not locate Laney before trial. According to the Petitioner, counsel informed him that it was partially his responsibility to ensure Laney's presence in court. However, he admitted that he also tried to find Laney but was unable to locate her prior to trial.

The Petitioner stated that during his trial, he saw Detective David Graves, a State witness, enter the door to the jury room while the jurors in his trial were deliberating. He claimed that the detective remained in the room for approximately five minutes and exited the jury room when the court summoned everyone for the reading of the verdict. The Petitioner claimed that when this

occurred, his sister-in-law told him she had seen the same detective go into the jury room twice on the previous day. The Petitioner maintained that he reported what he had seen to counsel, and she responded that "she would take care of it." However, the Petitioner testified that to his knowledge, she did not report the incident to anyone else.

Finally, the Petitioner testified that counsel appeared to be very fatigued during his trial. He stated that she told him "she had been up all night with a sick child." The Petitioner complained that although she was fatigued, counsel failed to make a motion for a continuance during his trial.

Counsel responded to the Petitioner's allegations at the post-conviction hearing and testified about her recollection of the Petitioner's case. An Assistant Public Defender at the time of the Petitioner's trial, she stated that she was appointed to the Petitioner's case in 1992 when another attorney in her office who had been handling the case left the Public Defender's Office to go into private practice. She reported that when she took over the Petitioner's case, she reviewed the Petitioner's file and notes made by the Petitioner's previous attorney. Counsel stated that she spoke with the Petitioner, his wife, other members of the Petitioner's family, the victim, and the victim's grandmother. Counsel testified that she left the Public Defender's Office in 1993 to start her own law practice, but stated that she continued to represent the Petitioner while in private practice. She recalled that the case did not go to trial until 1995.

Counsel testified that she spoke with the Petitioner between six and twelve times over the course of her representation of the Petitioner, which spanned approximately three years. She reported that she primarily spoke with the Petitioner over the phone, but she maintained that they also had "face-to-face meetings." She denied the Petitioner's claim that she did not speak with him for a year before trial. Counsel stated that her final meeting with the Petitioner occurred on the week of trial in her office; she stated that the Petitioner, his wife, his brother and his sister-in-law all attended the final meeting. Counsel testified that she also spoke with defense witnesses prior to trial. She stated that she spoke with Deborah Green, the Petitioner's sister-in-law and a defense witness, three times by phone and once in person before trial.

However, counsel admitted that in the year prior to trial, which occurred in December 1995, she actually spoke with the Petitioner only once prior to her final meeting with him immediately before trial. She explained that she tried on other occasions to return his phone calls but that she was unable to reach him and could not leave a message for him because he did not have an answering machine. Counsel stated that she also spoke with the Petitioner's wife several times during the year prior to trial. She explained that she felt it was unnecessary to meet with the Petitioner additional times during the year before trial because they had already prepared for trial. She stated that the Petitioner's case "kept getting bumped" during the three years that she represented him and that by the final year, she and the Petitioner had already discussed the facts of the case, the medical records, and their trial strategy.

Counsel testified that she found a note in the Petitioner's file at the time she was appointed to the Petitioner's case which indicated that a woman named Meme Laney might have information

that would be helpful to the defense. Counsel stated that she attempted to contact Laney, but was ultimately unable to locate her until after the Petitioner's trial had ended. She stated that in 1992 or 1993, the Petitioner or his wife gave her a telephone number for Laney, but the number did not work, and she could not find another listing. Counsel testified that when she has an extensive witness list, she normally requests funds from the court to hire an investigator to help her locate witnesses. However, she stated that she made no such request in this case, explaining, "at the time when we investigated the case, which was done probably most of '91 and '92, there were a few odds and ends left, like Ms. Laney, but everything else was pretty much investigated up until that time. And we had people to help [locate witnesses] in the Public Defender's Office." Counsel admitted that "[i]t would have been nice to have [Laney] at trial," but said she was not particularly concerned about her inability to locate Laney since witnesses are often not located in criminal cases. She did state, however, that she and others at the Public Defender's Office engaged in an "ongoing search" to find Laney prior to trial. Counsel admitted that she likely did not attempt to contact Laney in 1995, during the year preceding trial, because "at that point, [she] probably would have given up on finding" Laney. Counsel testified that she continued to try to locate Laney after trial and that in April 1996, she sent her fiancé to try to find Laney. She stated that eventually Tress Green,[1] the Petitioner's wife, located Laney.

Counsel also testified about her failure to have Dr. Corinne Bell available to testify at trial. Bell, a psychologist, evaluated the victim prior to trial. In her written evaluation, entered as an exhibit at the post-conviction hearing, Bell stated, "Regarding inappropriate touches, an interview was initiated. [The victim] denied that any such activity had happened." Counsel stated that she did not subpoena Bell as a witness because Bell had already been subpoenaed by the State. Counsel contended that during trial, she decided to call Bell as a witness for the defense. She stated, "[T]he General pulled a surprise on me and didn't call all of her witnesses. So, I thought I'd surprise her back and started calling some of hers." However, when counsel attempted to call Bell to the witness stand, Bell had left court and was no longer available to testify. Counsel therefore called another doctor to the stand instead. Counsel explained that she intended to have Bell testify that the victim was "observed to be an angry, controlling, manipulative person," and she stated that the doctor who testified in place of Bell brought this information to light. Concerning the statement in Bell's written evaluation of the victim that the victim had denied "inappropriate touches," counsel testified, "[T]hat wasn't the first time [the victim] had denied it. She had denied it to other people. This was cumulative more than particularly helpful. Would have been useful, but it wasn't devastating."

Regarding the Petitioner's claim that she did not effectively cross-examine the victim, counsel testified, "I don't know if I was particularly gentle, but I certainly wasn't out to scare her to death . . . . I got in, got my points, and went on, as I recall." Counsel pointed out that she did ask the victim on cross-examination whether she had ever told anyone that the Petitioner did not "hurt" her. In addition, she addressed the Petitioner's complaint that she did not cross-examine the victim about a statement that the child allegedly made to an employee of the Department of Human

---

[1] Although the Petitioner signed his affidavit "Green," his name throughout the technical record is shown as "Greene."

Services.  Apparently, while showing the employee a picture she had drawn of a man, the child indicated that "Jimmy" did not have any pubic hair. The statement was written on the drawing. This information was important because the Petitioner's wife, who introduced the drawing as an exhibit at trial, testified that her husband did not shave his pubic region, but that the victim's natural father, whose name is "James," had shaved his pubic hair on occasion.  Counsel explained that she chose not to question the victim about the statement during cross-examination for a few reasons: She explained that at the time she cross-examined the victim, the defense had not yet put on proof about the statement; she thought that it would be more effective to bring in this information through the victim's mother; and she believed that the drawing on which the statement was written "spoke for itself."  The drawing and the statement were later introduced at trial through the victim's mother.

When questioned about the Petitioner's allegation that Detective Graves had entered the jury room during jury deliberation, counsel testified that she had no recollection of being told that such an event had occurred.  She stated, "Somewhere in the back of my mind, I seem to recall [that the detective] went in [the jury room], but it was not when the jury was in there.  For some reason, I'm thinking there was a coffee maker in there and he was getting coffee.  But it was not while the [j]ury was there."  She maintained that had she known that the detective entered the room while the jury was present, she would have raised the issue in court.

With regard to the Petitioner's complaint concerning a bill of particulars, counsel testified that the defense never received a formal, written response from the State to the motion for a bill of particulars, which the Petitioner's first attorney filed.  However, she stated that in 1992, the Petitioner's first attorney received the following information from the State: The alleged abuse occurred between January and June 1991, and the "acts were digital/vaginal, digital/anal, and oral on the Petitioner by the victim."  She testified that she received the information from Shepard when she was appointed to the case and that she subsequently verified the information on the first day of trial.  Counsel explained that the State was unable to provide more specific dates because the information was obtained from a four-year-old, who could not remember specific dates or events in conjunction with the abuse.  She testified that at the close of proof, the State elected "vaginal penetration," but could not specify the date of the act because of the age of the victim.

Counsel further testified that it was her habit to tell all of her clients that the decision of whether to testify belongs to the client.  She stated that she informs each client, however, of the possible consequences of testifying.  She insisted that it ultimately was not her decision that the Petitioner not testify at trial.  She also maintained that the Petitioner emphatically denied her offers to inquire about plea agreements from the State.  She insisted that he refused to even consider any such offers.

Finally, counsel admitted that on the second day of the Petitioner's trial, she was tired because she had been up the night before with a sick child.  However, she stated, "I was able to do my job," and maintained that her fatigue did not affect her performance at trial.

Flo Latham, the victim's grandmother, testified that at the time of the Petitioner's arrest, she was the victim's primary caretaker. She stated that for an extended period of time after the Petitioner was charged in this case, she transported the victim to the Department of Human Services approximately once a week so that the victim could meet with her mother. Latham testified that she did not recall the victim's mother, Tress Green, ever bringing Vilma "Meme" Laney Lyons with her to any of the meetings, nor did she recall ever hearing the victim tell her mother that the Petitioner did not molest her. On cross-examination, Latham stated that she was not present for every visitation, but that on the occasions when she was not present for the visits, an employee of DHS would sit in the room with the victim and her mother.

Vilma "Meme" Laney Lyons was called to testify at the post-conviction hearing. She stated that she was a friend and former neighbor of the Petitioner and his wife, Tress Green, the victim's mother. Lyons stated that prior to the Petitioner's trial, she went to the Department of Human Services with Tress Green, the victim, and Flo Latham, the victim's grandmother. She reported that while they were sitting in the DHS waiting room, she overheard the victim tell her mother, "your Jimmy didn't do it." She stated that the victim was crying, appeared to be afraid, and was looking at her grandmother when she made the statement. In addition, Lyons testified that she had moved approximately three times since she had lived near the Greens, and she stated that she did not keep in contact with the Greens after she moved.

Deborah Green, the Petitioner's sister-in-law, testified that counsel summoned the Petitioner and all defense witnesses to her office "on a Sunday and [on] the first day of trial" and asked them to help locate Meme Lyons. She stated that she and her husband, the Petitioner's brother, found Lyons by contacting Lyons' former husband. She testified that it was "[n]ot too hard" to find her.

Deborah Green further testified that she saw Detective Graves enter the jury room twice on the second day of trial while the jurors were inside and once on the third day of trial during jury deliberations. She stated that he remained in the jury room for five minutes or less on each occasion. Green maintained that she informed counsel on the second day of trial about what she had seen, and counsel asked her to report the problem to the bailiff. Green claimed that she reported the problem to Bailiff Wayne Tipton and that Tipton told her he would "handle it."

Micki Kerr, the Petitioner's brother, testified that he saw Detective Graves exit the jury room immediately after the jury on the third day of trial. However, Kerr stated, "[I]f he [came] out of another room [other than] the Jurors' room, I don't know, because I can't see back there. So, he may have been in another room. . . . All I know is that he [exited] behind [the jurors]."

Detective David Graves, an investigator with the Maryville Police Department, testified that he investigated the Petitioner's case. He stated that he was present in the courtroom during the Petitioner's three-day trial. He insisted that he never entered the jury room during the Petitioner's trial and stated that he specifically recalled this fact. He also maintained that he never entered the jury room for coffee because he did not drink coffee.

Wayne Tipton, a court officer since 1989, testified that he is responsible for ensuring the jury's safety and comfort. He stated, "We take care of the Jury and see that people stay away from them . . . . [a]nd . . . get things that they need." Tipton testified that he specifically recalled the Petitioner's case. Despite Deborah Green's testimony to the contrary, Tipton maintained that no one reported to him that Detective Graves was seen entering and exiting the jury room during the Petitioner's trial.

## II. ANALYSIS

The Petitioner now argues that he is entitled to post-conviction relief because he received ineffective assistance of counsel at trial. In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-203. The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Id. § 40-30-210(f). A post-conviction court's findings of fact are afforded the weight of the jury and are conclusive on appeal unless the evidence in the record preponderates against those findings. Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of a particular case is de novo. Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact, and, as such, is subject to de novo review. Id.

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn.1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State,

629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

As a preliminary matter, we will address the State's contention that the judgment of the trial court should be affirmed on the basis of an incomplete appellate record. See Tenn. R. App. P. 24(b); State v. Banes, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993) (stating that it is the appellant's obligation to prepare a meaningful record for appellate review and that an appellate court cannot review an issue not preserved in the record). The State points out that the trial court's "Memorandum Opinion," which sets forth the trial court's post-conviction findings and conclusions, refers to an "attached Excerpt of Proceedings," but no such attachment is included in the record. However, it is clear from the Memorandum Opinion that the excerpt of proceedings referenced by the trial court is an excerpt of proceedings from the post-conviction hearing. Included in the record is a complete transcript of the post-conviction hearing, which includes extensive findings of fact by the trial court. We are therefore satisfied that the record in this case provides sufficient information upon which we may base our review. We will now proceed to consider the Petitioner's arguments on appeal.

The Petitioner first contends that his attorney was ineffective for failing to demand a bill of particulars from the State. In February 1992, the Petitioner's first attorney filed a "Motion for Bill of Particulars," requesting that the State provide "further information and detail regarding the day, place, and nature of the offense." In September 1992, the trial court ordered the State to advise the Petitioner "with as much specificity as possible" of the date and nature of the offense in this case. In November 1992, the Petitioner's first attorney filed a "Motion for Written Response for Bill of Particulars," stating that he had received an oral response to his motion for a bill of particulars but requesting that the State file a written response to the motion. No such written response was provided.

At the conclusion of the post-conviction hearing, the post-conviction court stated,
> The testimony that there was an oral response to the motion for a bill of particulars to Mr. Shepard prior to his withdrawal. And that [the Petitioner's attorney] was well aware of . . . the events used to support the State's claims. I noted that the jury instruction was tailored to set out the elements of the offense to require proof of vaginal penetration. It was put into the jury instruction. And no other definition of sexual penetration was given beyond what the State had elected, so the Jury was not instructed on other types of sexual penetration.

In its written Memorandum Opinion, the trial court stated,
> The State responded to the request for Bill of Particulars in detail to the lawyer who was first appointed to represent the [Petitioner]. This information was relayed to trial counsel and therefore the issue is without merit.

"The purpose of a bill of particulars is to allow a defendant to prepare his defense, to avoid surprise, and to preserve a plea of double jeopardy." State v. Anderson, 748 S.W.2d 201, 204 (Tenn. Crim. App. 1985); State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991). The Petitioner has not shown that he was in any way hampered in the preparation of his defense or that he was surprised at trial due to the State's failure to file a written response to his motion for a bill of particulars. The State advised the defense of the approximate dates and nature of the abuse in this case. This Court has concluded that in a case involving a young victim, the State's failure to be more specific in responding to a defendant's motion for a bill of particulars is not error where the State is unable to be more specific because of the victim's age. Id.; State v. Frances Lucindy Ballard, No. 99, 1991 WL 18697, at *10 (Tenn. Crim. App., Jackson, Feb. 20, 1991). We therefore conclude that the Petitioner has not shown any error on his counsel's part in failing to demand a written response to the motion for a bill of particulars, nor has he demonstrated any prejudice resulting from the State's failure to provide a written response. This issue is without merit.

Second, the Petitioner contends that his attorney was ineffective for not appealing the State's alleged failure to appropriately elect an offense for which the State could seek a conviction. The trial court determined that because the Petitioner did not raise this issue on direct appeal, it was waived. See Tenn. Code Ann. § 40-30-206(g). The post-conviction court stated, "That is something that should have been raised on appeal. [However,] I'll approach that from an ineffective assistance standpoint. If it had been raised on appeal, I do not think it would have resulted in any relief because of the way the jury instructions were tailored."

Although the issue of whether the State failed to appropriately elect an offense at trial may not be raised for the first time in an appeal from the dismissal of a post-conviction petition where the issue was not raised on direct appeal, see id., we may consider whether trial counsel's failure to raise the issue on direct appeal constituted ineffective assistance of counsel. Our review of the trial record indicates that the State elected the incident of vaginal penetration as the incident for which it sought to convict the Petitioner and proved facts sufficient to support a conviction of the elected offense. The courts of this state have "recognized the practical difficulties present in applying the election requirement to victims of child sexual abuse," State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999), and have implemented "broad guidelines to accommodate the practical difficulties" in such cases. Id. at 392. The Tennessee Supreme Court has stated, "In short, '[a]ny description that will identify the prosecuted offense for the jury is sufficient.'" Id. (citing State v. Shelton, 851 S.W.2d 134, 138 (Tenn. 1993)). We conclude that in this case, the State sufficiently complied with these guidelines at trial. Because we find that the State properly made an election in this case, we find no error by trial counsel in not raising this issue on direct appeal.

Third, the Petitioner argues that his attorney was ineffective for failing to effectively cross-examine the victim at trial. The State points out that this issue was apparently not raised at the post-conviction evidentiary hearing, and the trial court made no ruling concerning disposition of the issue. The only reference to such an issue in the Petitioner's petition for post-conviction relief is his statement that "[c]ounsel did not question witnesses to see if they were reliable witnesses or if they were telling the truth."

As previously stated, a petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Id. § 40-30-210(f). The Petitioner in this case has failed to meet this burden. Nevertheless, we are unconvinced from our review of the record that Petitioner's counsel failed to effectively cross-examine the victim at trial. This Court has noted that "cross-examination is a strategic and tactical decision of trial counsel, which is not to be measured by hindsight." State v. Kerley, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991); see also Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Trial counsel testified at the post-conviction hearing about her strategy for cross-examining the victim. We may not second-guess her tactics on appeal. See id. We also acknowledge the unique difficulty of cross-examining a child at trial, especially concerning the sensitive issue of sexual abuse. Having thoroughly reviewed the record in this case, we are satisfied that counsel was not ineffective in her cross-examination of the victim.

Fourth, the Petitioner argues that his attorney was ineffective for failing to properly advise him concerning his right to testify and his right to seek a plea agreement. At the post-conviction hearing, the trial court made no findings regarding this issue, but testimony was presented about the issue: The Petitioner maintained that counsel refused to allow him to testify at trial. The Petitioner also testified that his attorney refused to discuss any plea agreement offers from the State until he waived his right to a trial. Counsel refuted these allegations. She testified that the Petitioner made the final decision not to testify at trial. She further testified that the Petitioner emphatically denied her offers to inquire about plea agreements from the State and stated that the Petitioner refused to consider the possibility of a plea bargain. No other testimony was presented at the post-conviction hearing concerning this issue.

As we have previously stated, a petitioner for post-conviction relief bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f). The petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993).

We are unconvinced on the basis of the record before us that the Petitioner's attorney refused to convey plea agreement offers from the State to her client until he waived his right to a trial. However, even assuming that she did so, the Petitioner has failed to show prejudice resulting from any such error. At the post-conviction hearing, the Petitioner stated, "I asked [my attorney] what [the State was] offering, not that I was going to plead guilty or anything." Thus, it seems that although the Petitioner complains that his attorney refused to convey plea agreement offers from the State, he had no intention of entering into a plea agreement.

We are also unconvinced from a review of the record that the Petitioner's attorney made a unilateral decision that the Petitioner not testify at trial. However, assuming that she did so, the Petitioner has again failed to show prejudice resulting from such an error. The Petitioner offered no testimony at the post-conviction hearing concerning what his testimony would have been at trial or

how his testimony would have affected the result of the trial. We therefore conclude that this issue is without merit.

Fifth, the Petitioner argues that his attorney was ineffective for failing to inform the trial court of allegations that a State's witness was in the jury room with the jury during the pendency of trial. With regard to this issue, the trial court made the following findings:

[A]ddressing the issue of Detective Graves being in the jury room, . . . giving everybody the benefit of the doubt that testified about that . . . on the Petitioner's . . . behalf, they may have seen Detective Graves around the jury room at some time. . . . [T]hey may have seen him come into the courtroom after the Jury, but I know that when the Jury came in to report their verdict that he did not file out of the jury room with the Jury because I was watching. [The Petitioner's attorney] does not recall anything being said to her about that. . . . [I]f [she] had, bringing it to my attention at that point would have been the proper thing to do, so it could have been resolved. And if I needed to question any of the Jurors, I could have and then that would have cleared it up and we'd have a clear record and there wouldn't be any problem.

But I have to decide it based on this evidence. There isn't any testimony from any of the Jurors. And I am not persuaded at all that he was in the jury room while the Jury was in there. What just exactly happened to lead these witnesses to say what they did, I don't know. But I know our Jury didn't come and go from the outside door as a general course.

And so [the Petitioner's attorney's] failure to do anything about that, I find, doesn't support any relief because basically I find that it didn't happen.

We must afford the post-conviction court's findings of fact the weight of the jury, and the court's findings are conclusive on appeal unless the evidence in the record preponderates against those findings. Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). Having reviewed the record in this case, we conclude that the evidence does not preponderate against the trial court's finding that Detective Graves did not enter the jury room during the Petitioner's trial. Therefore, we conclude that Petitioner's counsel was not ineffective for failing to bring the matter to the trial court's attention.

Finally, we note that the post-conviction court found that trial counsel was ineffective in her representation of the Petitioner regarding her failure to have two witnesses, Vilma "Meme" Laney Lyons and Dr. Corinne Bell, available to testify at trial. However, the court concluded that counsel's failure in this regard did not prejudice the outcome of the trial. With regard to counsel's failure to locate Vilma "Meme" Laney Lyons, the court opined,

I don't think the failure regarding Ms. Laney-Lyons . . . would have made any difference. Because I think either one of two things would have happened: Either the child never said that in the first place and she's making it up, or it was said in something totally out of context that didn't have anything to do with the critical issue here. Because the child, according to Ms. Lyons' testimony, wasn't talking to her.

The child was talking to her mother, Tress. And her mother Tress testified at trial and could very easily have said, my daughter told me when I went over to DHS that it wasn't my Jimmy that did it. And there was no such testimony coming from her. And had that been available, I'm sure it would have been elicited.

As the Court of Appeals said earlier, even if the child had said it, it is something that could be used to impeach the credibility of a very young child who gave extremely detailed and emphatic testimony on the witness stand.

But having to decide what the impact of that testimony would have been on the Jury, I don't think that testimony legitimately existed. Or if it did, I don't think it was relevant because it wasn't addressed with the witness to whom the statement originally, supposedly, would have been made.

Regarding counsel's failure to subpoena Corinne Bell to testify at trial, the post-conviction court stated,

In this case, based on the physical evidence, the medical testimony, there was no question that the inappropriate touches had happened. That was proved without any doubt. The issue was who did it. A prior statement by this child when she was in an agitated state, for whatever reason, to Dr. Bell saying that nothing happened would not carry much weight at all, I don't think. There could have been all kinds of follow-up testimony about the effect that abuse has on a child and how they'll say things and all of that.

You know, if she had said to Dr. Bell that something happened but it wasn't my step-father Jimmy that did it, it could be a whole different situation, but just a blanket denial that anything had happened when it was so clear from evidence outside of the child's testimony that something had happened – while I think that adequate counsel would have required having that witness available, the impact of that testimony, I think, would have been very minimal.

In addition, the post-conviction court found that "trial counsel's trial preparation was lacking, but given the peculiar circumstances regarding changes in attorneys and the length of time the case was pending, it had no effect on the outcome of the trial." We agree with these conclusions by the post-conviction court.

Accordingly, we AFFIRM the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE